UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| UNITED STATES OF AMERICA, | ) | | |
| | ) | | |
| v. | ) | No. | 04-cr-273 (RBW) |
| | ) | | |
| WILLIAM LAWSON, | ) | | |
| | ) | | |
| Defendant. | ) | | |
| | ) | | |

EMERGENCY
MOTION TO REDUCE SENTENCE PURSUANT TO
THE COMPASSIONATE RELEASE STATUTE
18 U.S.C. § 3582(c)(1)(A)(i)

Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), Mr. William Lawson, through undersigned counsel, respectfully requests that this Court grant him compassionate release from the remaining one month and 10 days of his sentence, in light of his age (42) and diagnosed lung disease (asthma) that may make him particularly susceptible to contracting and having more serious complications from the coronavirus (COVID-19). The hospitalization and death rate for COVID-19 increases with age, "starting … from around 40 years."[1] Additionally, "[p]eople with moderate to severe asthma may be at higher risk of getting very sick from COVID-19," including contracting "pneumonia and acute respiratory disease,"[2] which could result in a

---

[1]     World Health Organization (WHO), *Coronavirus disease 2019 (COVID-19) Situation Report – 51* at 2, https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200311-sitrep-51-covid-19.pdf?sfvrsn=1ba62e57_8.

[2]     Centers for Disease Control and Prevention (CDC), *Coronavirus Disease 2019 (COVID-19): People Who Need Extra Precautions: People Who Are at High Risk*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/asthma.html ("People Who Are At High Risk").

devastating prognosis in this time of ventilator shortage.[3]  COVID-19 has now killed 30 federal inmates, and, as of April 29, 2020, the BOP reports that an additional 2,184 inmates and staff have tested positive.[4]  Currently 12 inmates and 3 staff are reported as testing positive at Mr. Lawson's facility, FCI Butner Low.[5]  These numbers are undoubtedly an undercount.

Mr. Lawson's release date is June 8, 2020.  He should have been transferred to a halfway house in March 2020, but the BOP erroneously believed that a warrant had been issued for Mr. Lawson in 2018 (at a time when he was incarcerated).  Although Mr. Lawson has now cleared up this confusion, he has not been moved to a halfway house, likely because Hope Village, the District's only halfway house for men, is closing on April 30, 2020.[6]  Mr. Lawson therefore asks this Court to order his immediate release from Butner Low, so that he may live with two others at a home in Northwest D.C., rather than at the "petri dish[]"of an institution with 1,275 inmates and countless correctional officers, where the risks of infection cannot be overstated.[7]

---

[3]    Kyle Cheney, *FEMA Tells Lawmakers Most New Ventilators Won't Be Ready Until June*, Politico (April 2, 2020) https://www.politico.com/news/2020/04/02/fema-coronavirus-ventilators-161840.

[4]    *See* BOP, *COVID-19 Cases*, https://www.bop.gov/coronavirus/  (accessed 4/29/2020 9:00 a.m.).

[5]    *Id.*

[6]    *See* Justin Wm. Moyer, et al., *D.C.'s only halfway house for men is 'winding down' amid coronavirus concerns*, The Washington Post (April 16, 2020), available at https://www.washingtonpost.com/local/dcs-only-halfway-house-for-men-is-winding-down-amid-coronavirus-concerns/2020/04/16/c49be3fc-8007-11ea-8de7-9fdff6d5d83e_story.html.

[7]    *See* NPR, *Barr: Federal Prisons Mustn't Become 'Petri Dishes' For Coronavirus* (Mar. 26, 2020), https://www.npr.org/sections/coronavirus-live-updates/2020/03/26/822016191/barr-federal-prisons-mustnt-become-petri-dishes-for-coronavirus; *see also* BOP, *FCI Butner Low*, https://www.bop.gov/locations/institutions/buf/ (accessed Apr. 29, 2020 at 3:16 p.m.).

## RELEVANT FACTS AND BACKGROUND

In September 2005, Mr. Lawson was found guilty after a jury trial of felon-in-possession (Count 1), and the lesser-included offenses of two counts with which he had been charged: simple possession of crack, a lesser included misdemeanor of Count 2, and simple possession of marijuana, a lesser included misdemeanor of Count 3. *See* Verdict Form (Sep. 14, 2005), ECF No 27. This Court first sentenced Mr. Lawson to a combined 166 months of imprisonment, which was thereafter lowered to 144 months of imprisonment. *See* Judgment (Feb. 8, 2006), ECF No. 35; Order Resentencing Defendant (Mar. 13, 2008), ECF No. 62. After an appeal, in April 2011, the sentence was lowered to time-served, to be followed by three years of supervised release. Judgment, ECF No. 83 (Apr. 5, 2011).

In February 2014, Mr. Lawson pleaded guilty in Case No. 13-cr-290 (BAH), to one count of unlawful possession with intent to distribute 28 grams or more of crack cocaine. *See* No. 13-cr-290 (BAH), ECF No. 6 (Plea Ag't). The PSR in that case indicated that Mr. Lawson was born with and continued to suffer from chronic asthma. *See* No. 13-cr-290 (BAH), PSR ¶62. He was sentenced to 70 months of imprisonment, to be followed by 60 months of supervised release. *See* No. 13-cr-290 (BAH), ECF No. 18. According to the BOP's Designation and Sentence Computation Center (DSCC), this sentence began to run on June 6, 2014.

This Court revoked Mr. Lawson's supervised release in this case in June 2014, and imposed a 24-month term of imprisonment, consecutive to the 70-month sentence in No. 13-cr-290, with no supervised release to follow. *See* Judgment on Revocation (Jun. 26, 2014), ECF No. 90.

Counsel has repeatedly called and emailed Butner Low to make contact with her client but been unsuccessful.[8]  With no way of knowing whether Mr. Lawson had requested either compassionate release or home confinement from his institution, on April 29, 2020, counsel submitted a compassionate release request, as well as a request that Mr. Lawson be considered for home confinement for the remainder of his sentence, to the Warden of Butner Low.  *See* Ex. A.

DSCC has informed counsel that Mr. Lawson has completed the 70-month sentence in No. 13-cr-290 and is now serving the 24-month consecutive sentence in this case.  His current projected release date is June 8, 2020.

## APPLICABLE LEGAL PRINCIPLES

In the First Step Act of 2018, Pub. L. 115-391 (Dec. 21, 2018), Congress amended 18 U.S.C. § 3582(c)(1)(A)(i) to allow a defendant to file a motion for a reduction of sentence based on extraordinary and compelling reasons.  Prior to this amendment, the BOP was the sole entity allowed to file such a request.  Now, a defendant may file such a motion "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]"  First Step Act § 603(b).

Section 3582(c)(1)(A) provides, in relevant part, that the Court "may reduce the term of imprisonment, after considering the factors set forth in [18 U.S.C. §] 3553(a) to the extent they are applicable, if it finds that—"

---

[8]      Counsel has been in contact with Mr. Lawson's girlfriend, with whom he will live upon his release, to confirm his asthma diagnosis and what occurred relating to his halfway house designation.  Once counsel receives any medical records supporting the asthma diagnosis and any other relevant prison records, counsel will file them with the Court.

> (i)    extraordinary and compelling reasons warrant such a reduction; or
>
> (ii)    the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A).

The Sentencing Commission's applicable guidance was issued before the passage of the First Step Act and has not been amended to account for the statutory changes to § 3582. Accordingly, courts have held that "the most sensible interpretation of the Sentencing Commission's guidance in light of Congress's recent statutory amendments is that 'the Commission's existing policy statement provides helpful guidance on the factors that support compassionate release, although it is not ultimately conclusive.'" *United States v. Bucci*, 409 F. Supp. 3d 1, 2 (D. Mass. 2019) (quoting *United States v. Fox*, No. 2:14-cr-03-DBH, 2019 WL 3046086, at *5 (D. Me. July 11, 2019)); *see also United States v. Beck*, No. 1:13-cr-186-6, 2019 WL 2716505, at *6 (M.D.N.C. June 28, 2019) ("While the old policy statement provides helpful guidance, it does not constrain the Court's independent assessment of whether 'extraordinary and compelling reasons' warrant a sentence reduction under § 3582(c)(1)(A)(i).").

Tracking the language of the statute, the Guidelines suggest that a sentence reduction may be warranted if "the court determines that—"

> (1)    (A)  extraordinary and compelling reasons warrant the reduction; or
>
>        (B)  the defendant (i) is at least 70 years old; and (ii) has served at least 30 years in prison pursuant to a sentence imposed under 18 U.S.C. § 3559(c) for the offense or offenses for which the defendant is imprisoned;

(2)      the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and

(3)      the reduction is consistent with this policy statement.

U.S.S.G. § 1B1.13.

According to the Guidelines application notes, "extraordinary and compelling reasons exist" when the defendant is (1) "suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory)," though "[a] specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required," *Id*. appl. n. 1(A)(ii); or (2) "suffering from a serious physical or medical condition," "suffering from a serious functional or cognitive impairment," or "experiencing deteriorating physical or mental health because of the aging process" "that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover," *Id*. appl. n. 1(A)(ii).  Extraordinary and compelling reasons also exist when "[t]he defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less."  Id. appl. n. 1(B).

However, a sentence reduction may also be warranted for "[o]ther [r]easons," such as where "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with," his medical condition and/or age.  *Id*. appl. n. 1(D).[9]

---

[9]      To the extent that application note 1(D) restricts "other reasons" to those "as determined by Director of BOP," it conflicts with the First Step Act's statutory amendments and does not apply.  *See United States v. Cantu*, 2019 WL 2498923, at *4 (S.D. Tex. June 17, 2019).  Instead, "[r]ead in light of the First Step Act, it is consistent with the old policy statement and with the Commission guidance more generally for courts to exercise similar discretion as that previously reserved to the BOP Director in evaluating motions by defendants for compassionate release." *Beck*, 2019 WL 2716505, at *9.  Even before the First Step Act, the Commission recognized "that courts are in a 'unique' position to determine whether such circumstances are present."  *Id*.

The Guidelines application notes further provide:

[A]n extraordinary and compelling reason need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment. Therefore, the fact that an extraordinary and compelling reason reasonably could have been known or anticipated by the sentencing court does not preclude consideration for a reduction under this policy statement.

*Id*. appl. n. 2.  They also recognize that "[t]he court is in a unique position to determine whether the circumstances warrant a reduction."  *Id*. appl. n. 4.  Thus, "[r]ead as a whole, the application notes suggest a flexible approach which considers all relevant circumstances."  *Beck*, 2019 WL 2716505, at *8.

The BOP program statement on compassionate release is relevant only to the extent that its criteria are broader than those described in the Guidelines.  *See* U.S.S.G. § 1B1.13, appl. n. 1(D) (instructing that the Director of the BOP may designate *additional* "extraordinary and compelling reason[s]").  It generally parallels the policies in the Guidelines.  *See* PS 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g) ("BOP Program Statement"), at pp. 4-7 (Jan. 17, 2019) (providing compassionate release consideration for inmates with "terminal" or "debilitated" medical conditions).  The statement also recognizes that a sentence reduction may be warranted for "Elderly Inmates," including those "age 65 or older who have served the greater of 10 years or 75% if the term of imprisonment to which the inmate was sentenced."  *Id*. at p. 6 (noting "[t]hese criteria are different from those provided in [§] 3582(c)(1)(A)(ii)").[10]

---

at *9 & n.11; U.S.S.G. § 1B1.13 appl. n. 4.

[10]    *But see The Impact of an Aging Inmate Population on the Federal Bureau of Prisons*, Office of Inspector General, U.S. Dep't of Just. ("*Aging Inmate Population*") at 45-46 (May 2015) (Rev. Feb. 2016), https://oig.justice.gov/reports/2015/e1505.pdf  (concluding that these criteria for elderly inmates are unclear, confusing, and overly-restrictive).

Notably, the First Step Act "was enacted to further increase the use of compassionate release and . . . explicitly allows courts to grant such motions even when BOP finds they are not appropriate." *Beck*, 2019 WL 2716505, at *6. Indeed, by permitting defendants to file sentence reduction motions directly with the sentencing court, regardless of whether the BOP has weighed in, the First Step Act reflects Congress's aim to diminish the BOP's control over compassionate release. *See United States v. Cantu*, 2019 WL 2498923, at *4 (S.D. Tex. June 17, 2019) (explaining that "defendants no longer need the blessing of the BOP to bring such motions").

This Court may determine whether a defendant's conditions are extraordinary and compelling independent of those reasons provided by the Commission or the BOP. Courts have concluded that, after passage of the First Step Act, compassionate release is not limited by the Commission's or the BOP's understanding of "extraordinary and compelling reasons," and that courts can thus determine those reasons. *See United States v. Urkevich*, 2019 WL 6037391, at *3 (D. Neb. Nov. 14, 2019); *United States v. Bellamy*, 2019 WL 3340699, at *2 n. 5 (D. Minn. July 25, 2019) (citing lower court decisions); *Beck*, 2019 WL 2716505, at *5-6 (noting the First Step Act "was enacted to further increase the use of compassionate release and . . . explicitly allows courts to grant such motions even when BOP finds they are not appropriate"); *Cantu*, 2019 WL 2498923, at *3-5.

## ARGUMENT

## I.   THIS COURT HAS JURISDICTION TO DECIDE THIS MOTION AND ANY FAILURE TO COMPLY WITH THE BOP'S EXHAUSTION REQUIREMENTS SHOULD BE EXCUSED.

Counsel submitted a compassionate release request with the Warden of Butner Low for Mr. Lawson on April 29, 2020. This Court need not, however, wait to decide this motion. This Court should excuse compliance with the BOP's administrative exhaustion requirements, which

take at least 30 days and can go on much longer, given the documented and serious national

emergency. *See Hendricks v. Zenon*, 993 F.2d 664, 672 (9th Cir. 1993) (quoting *Granberry v.

Greer*, 481 U.S. 129, 134 (1987)) (recognizing that "exceptional circumstances of peculiar

urgency" can excuse exhaustion).

The exhaustion requirement found in 18 U.S.C. § 3582(c)(1)(A) does not limit a federal

court's jurisdiction to grant a reduction in sentence; it is a "claims processing" rule that "merely

controls who—the BOP or defendant—may move for compassionate release and when such a

motion may be made.  It simply delineates the process for a party to obtain judicial review, not

referring to the adjudicatory capacity of courts."  *United States v. Haney*, No. 19-cr-541 (JSR),

2020 WL 1821988, at *2 (S.D.N.Y. Apr. 13, 2020).  Thus, it can be waived.  *Id*. at *3.  *See also*

*United States v. Russo*, No. 16-cr-441 (LJL), 2020 WL 1862294, at *4 (S.D.N.Y. Apr. 14, 2020)

(same).

As many federal courts have now ruled, the exhaustion requirement contained in 18

U.S.C. § 3582(c) is not absolute, and it may be waived in certain extraordinary circumstances,

which describes the threat posed by the COVID-19 pandemic.  *United States v. Smith*, No. 12

CR. 133 (JFK), 2020 WL 1849748, at *2 (S.D.N.Y. Apr. 13, 2020); *Haney*, 2020 WL 1821988,

at *4  ("in the extraordinary circumstances now faced by prisoners as a result of the COVID-19

virus and its capacity to spread in swift and deadly fashion, the objective of meaningful and

prompt judicial resolution is clearly best served by permitting Haney to seek relief before the 30-

day period has elapsed."); *United States v. Sawicz*, No. 08 Cr. 287 (ARR), 2020 WL 1815851

(E.D.N.Y. Apr. 10, 2020); *United States v. McCarthy*, No. 3:17-CR-0230 (JCH), 2020 WL

1698732, at *4 (D. Conn. Apr. 8, 2020) (excusing exhaustion requirement because "[e]ven a few

weeks' delay carries the risk of catastrophic health consequences" for prisoner in high risk

group); *United States v. Zukerman*, No. 16 CR. 194 (AT), 2020 WL 1659880, at *4 (S.D.N.Y. Apr. 3, 2020) (waiving exhaustion requirement, given defendant's advanced age, health conditions putting him in a high risk group for complications and death resulting from COVID-19, and fact that he was in a detention facility where prisoners live in crowded conditions); *United States v. Perez*, No. 17 Cr. 513-3, 2020 WL 1546422, at *2 (S.D.N.Y. Apr. 1, 2020) (waiving § 3582(c)(1)(A)'s exhaustion requirement where delay carried the risk of the vulnerable defendant contracting COVID-19); *United States v. Colvin*, No. 19 Cr. 179, 2020 WL 1613943, at *2 (D. Conn. Apr. 2, 2020) ("[I]n light of the urgency of [d]efendant's request, the likelihood that she cannot exhaust her administrative appeals during her remaining eleven days of imprisonment, and the potential for serious health consequences, the [c]ourt waives the exhaustion requirement of Section 3582(c)(1)(A)."); *see also Matter of Extradition of Toledo Manrique*, No. 19-MJ-71055, 2020 WL 1307109, at *1 (N.D. Cal. Mar. 19, 2020) (refusing to delay consideration of release to await evidence of an outbreak in the jail because that "may be too late").

This Court should waive the exhaustion requirement because Mr. Lawson only has 40 days left of his sentence and his health and life would be at risk if the Court were to wait 30 days. *See United States v. Powell*, No. 94-cr-316, ECF No. 98 (Mar. 28, 2020) (waiving exhaustion under § 3582(c)(1)(A) where the inmate had not filed a compassionate release request, finding that "requiring defendant to first seek relief through the [BOP] administrative process would be futile"); *United States v. Jennings*, No. 18-cr-17 (TSC), ECF No. 30 (Apr. 22, 2020) at 2-4 (finding exhaustion requirement to be non-jurisdictional and waived in this circumstance).

II.   **THE COVID-19 GLOBAL PANDEMIC IS AN EXTRAORDINARY AND COMPELLING REASON TO GRANT MR. LAWSON COMPASSIONATE RELEASE.**

   **A.  The Emergence of COVID-19, By Itself, is An Extraordinary Circumstance.**

On March 11, 2020, the World Health Organization ("WHO") officially classified the spread of COVID-19, the disease caused by the novel coronavirus, as a pandemic.[11]  On March 13, 2020, the President of the United States declared the COVID-19 outbreak a national emergency under the National Emergencies Act, 50 U.S.C. §§ 1601 et seq.[12]  Several days later, the White House issued guidance recommending that gatherings of *ten or more* persons be canceled or postponed.[13]  As of April 27, 2020, "316 million people in at least 42 states, three counties, 10 cities, the District of Columbia and Puerto Rico are being urged to stay home" and practice social distancing when they cannot.[14]

In the weeks since these pronouncements, COVID-19 has continued to spread at an alarming rate.  As of April 27, 2020, nearly 2.8 million people have been infected globally and

---

[11]    "WHO Characterizes COVID-19 as a Pandemic," World Health Organization (March 11, 2020), https://bit.ly/2W8dwpS.

[12]    The White House, *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak* (March 13, 2020), https://www.whitehouse.gov/presidential-actions/proclemation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.

[13]    Sheri Fink, *White House Takes New Line After Dire Report on Death Toll*, New York Times (March 17, 2020), https://www.nytimes.com/2020/ 03/17/us/coronavirus-fatality-rate-white-house.html?action=click&module= Spotlight&pgtype=Homepage.

[14]    Sarah Mervosh et. al, *See Which States and Cities Have Told Residents to Stay at Home,* The New York Times (last updated April 20, 2020) https://www.nytimes.com/interactive/2020/us/coronavirus-stay-at-home-order.html.

over 190,000 have died.[15]  In the United States, more than 900,000 people have been infected

and more than 52,000 people have died.[16]  (The numbers, which increase sharply every day,

almost certainly underrepresent the true scope of the crisis in the U.S. considering the

widespread unavailability of test kits to detect the virus.)  To stem the spread of the disease, the

Centers for Disease Control (CDC) broadly advised people to take basic preventive actions, such

as avoiding crowds, staying six feet away from others, keeping surfaces disinfected, and

frequently washing their hands or using hand sanitizer.[17]

 At the same time, public health experts have warned that incarcerated individuals "are at

special risk of infection" and are "less able to participate in proactive measures to keep

themselves safe."[18]  Indeed, the conditions in BOP facilities provide a uniquely hospitable

environment for COVID-19 to spread.[19]  Prior to March 13, 2020, when the BOP suspended

---

[15] World Health Organization (WHO), *Coronavirus disease 2019 (COVID-19) Situation Report – 97* at 1, https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200422-sitrep-93-covid-19.pdf?sfvrsn=35cf80d7_4.

[16] Centers for Disease Control (CDC), *Cases of Coronavirus Disease (COVID-19) in the U.S.*, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html.

[17] Centers for Disease Control (CDC), *Coronavirus Disease 2019 (COVID-19): How to Protect Yourself and Others*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html.

[18] "Achieving a Fair and Effective COVID-19 Response:  An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States" (March 2, 2020), https://law.yale.edu/sites/default/files/area/center/ghjp/documents/final_covid-19_letter_from_public_health_and_legal_experts.pdf.

[19] Joseph A. Bick, *Infection Control in Jails and Prisons,* Clinical Infectious Diseases 45(8): 1047-1055 (2007), https://doi.org/10.1086/521910; Keegan Hamilton, *Sick Staff, Inmate Transfers, and No Tests: How the U.S. is Failing Federal Inmates as Coronavirus Hits*, Vice (Mar. 24, 2020), https://www.vice.com/en_us/article/jge4vg/sick-staff-inmate-transfers-and-no-

visits for 30 days, inmates regularly engaged in social, legal and medical visits with people in the community at a time when the novel coronavirus has already begun its spread.[20]  To this day, inmates must share communal living spaces, such as cells, recreation rooms, dining halls, libraries, and exercise yards.  To make matters worse, hand sanitizer, an effective disinfectant recommended by the CDC to reduce transmission, is deemed forbidden "contraband" in BOP facilities because of its alcohol content.[21]

Recognizing the unique risks that correctional facilities pose to both inmates and employees, members of Congress asked the BOP on March 18, 2020, to allow for the immediate release of "federal inmates who are vulnerable to COVID-19 (for instance, persons who are pregnant, who are 50 years old and older, and who suffer from chronic illnesses like asthma, cancer, heart disease, lung disease, diabetes, HIV, or other diseases that make them vulnerable to COVID-19 infection)."[22]  The following week, Attorney General Barr urged the Director of the

---

tests-how-the-us-is-failing-federal-inmates-as-coronavirus-hits ("Sick Staff, Inmate Transfers, and No Tests").

[20]     BOP, *Federal Bureau of Prisons Covid-19 Action Plan*, https://www.bop.gov/resources/news/20200313_covid-19.jsp.

[21]     Keri Blakinger & Beth Schwarzapfel, *How Can Prisons Contain Coronavirus When Purell is Contraband?*, ABA Journal (March 13, 2020), https://www.abajournal.com/news/article/when-purell-is-contraband-how-can-prisons-contain-coronavirus.

[22]     Press Release, *Nadler & Bass Demand Answers from DOJ About Federal Bureau of Prisons & U.S. Marshals Service Response to Coronavirus* (Mar. 19, 2020), https://judiciary.house.gov/news/documentsingle.aspx?DocumentID=2885 ("DOJ and BOP must also do all they can to release as many people as possible who are currently behind bars and at risk of getting sick. Pursuant to 18 U.S.C. 3582(c)(1)(A), the Director of the Bureau of Prisons may move the court to reduce an inmate's term of imprisonment for 'extraordinary and compelling reasons.'").

BOP to prioritize home confinement for such vulnerable individuals.[23]  On March 27, 2020, more than 400 former DOJ leaders, attorneys, and federal judges sent an open letter to the President, asking that he take immediate action to reduce the population in correctional facilities to prevent the catastrophic spread of COVID-19, in particular by commuting the sentences of elderly or medically vulnerable inmates, including those with asthma.[24]  The same day, dozens of leading public health experts made a similar request, asking the President to commute the sentences of all medically vulnerable people.[25]  That so many stakeholders have come together to ask for the release of medically vulnerable inmates underscores the extraordinary nature of this pandemic.

### B. The Inability of the Bureau of Prisons to Contain COVID-19 is a Compelling Reason to Grant Compassionate Release.

Like cruise ships and nursing homes, prisons are "closed settings [that] have long been known to be associated with high transmission probabilities for infectious diseases."  *See* Ex. B (DC Medical and Public Health School Faculty COVID-19 Letter) at 3.  Despite the BOP's lagging efforts to take precautionary measures, it has proven itself woefully unprepared to contain the virus's spread.  The number of staff and inmates within the BOP who have tested positive for COVID-19 has nearly doubled every few days over the past weeks.  In fact, as of the

---

[23]     AG Barr, *Prioritization of Home Confinement as Appropriate Response to COVID-19 Pandemic* (Mar. 26, 2020), https://www.justice.gov/file/1262731/download.

[24]     *Letter to President Donald J. Trump of Former United States Attorneys, Federal Judges, Assistant United States Attorneys, and DOJ Lawyers and Leaders*, (March 27, 2020) https://fairandjustprosecution.org/wp-content/uploads/2020/03/Letter-to-Trump-from-DOJ-and-Judges-FINAL.pdf.

[25]     *Letter to President Donald J. Trump of Public Health Experts* (March 27, 2020) https://thejusticecollaborative.com/wp-content/uploads/2020/03/Public-Health-Expert-Letter-to-Trump.pdf.

date of this filing, the BOP reports that 2,184 inmates and staff have tested positive for COVID-19; in addition, 30 federal inmates have died while in custody.[26]  Butner Low itself has 15 cases, though it is within a complex with many times that number.[27]  "[M]ore than a dozen workers in the Bureau of Prisons" have reported that "federal prisons are ill-prepared for a coronavirus outbreak," while staff at one low-security facility described a potential outbreak as "mass chaos," and confirmed that BOP is "just not prepared to handle something of that nature."  As the following charts make clear, the COVID-19 pandemic is growing exponentially within the BOP.[28]



---

[26]     *See* BOP, *COVID-19 Cases*, https://www.bop.gov/coronavirus/ (accessed 4/29/2020 4:10 p.m.).

[27]     *Id.*

[28]     Information updated daily at https://federaldefendersny.org/

Number of Reported COVID-19 Cases in Bureau of Prisons[3] and the United States[4], Compared by Days since First Reported Infection

| Day of Known COVID-19 Case | BOP Date | BOP Infections | U.S. Date | U.S. Infections |
|---|---|---|---|---|
| Day 1 | 3/20/2020 | 2 | 1/22/2020 | 1 |
| Day 2 | 3/21/2020 | 3 | 1/23/2020 | 1 |
| Day 4 | 3/23/2020 | 6 | 1/25/2020 | 2 |
| Day 5 | 3/24/2020 | 9 | 1/26/2020 | 5 |
| Day 7 | 3/26/2020 | 18 | 1/28/2020 | 5 |
| Day 8 | 3/27/2020 | 27 | 1/29/2020 | 5 |
| Day 10 | 3/29/2020 | 38 | 1/31/2020 | 7 |
| Day 11 | 3/30/2020 | 52 | 2/1/2020 | 8 |
| Day 12 | 3/31/2020 | 59 | 2/2/2020 | 8 |
| Day 13 | 4/1/2020 | 94 | 2/3/2020 | 11 |
| Day 14 | 4/2/2020 | 114 | 2/4/2020 | 11 |
| Day 15 | 4/3/2020 | 141 | 2/5/2020 | 11 |
| Day 16 | 4/4/2020 | 174 | 2/6/2020 | 11 |
| Day 17 | 4/5/2020 | 197 | 2/7/2020 | 11 |
| Day 18 | 4/6/2020 | 259 | 2/8/2020 | 11 |
| Day 19 | 4/7/2020 | 313 | 2/9/2020 | 11 |
| Day 20 | 4/8/2020 | 377 | 2/10/2020 | 11 |
| Day 21 | 4/9/2020 | 408 | 2/11/2020 | 12 |
| Day 22 | 4/10/2020 | 481 | 2/12/2020 | 12 |
| Day 23 | 4/11/2020 | 520 | 2/13/2020 | 13 |
| Day 24 | 4/12/2020 | 541 | 2/14/2020 | 13 |
| Day 25 | 4/13/2020 | 589 | 2/15/2020 | 13 |
| Day 26 | 4/14/2020 | 694 | 2/16/2020 | 13 |
| Day 27 | 4/15/2020 | 731 | 2/17/2020 | 13 |
| Day 28 | 4/16/2020 | 752 | 2/18/2020 | 13 |
| Day 29 | 4/17/2020 | 761 | 2/19/2020 | 13 |
| Day 30 | 4/18/2020 | 784 | 2/20/2020 | 13 |
| Day 31 | 4/19/2020 | 804 | 2/21/2020 | 15 |
| Day 32 | 4/20/2020 | 816 | 2/22/2020 | 15 |
| Day 33 | 4/21/2020 | 863 | 2/23/2020 | 15 |
| Day 34 | 4/22/2020 | 908 | 2/24/2020 | 15 |
| Day 35 | 4/23/2020 | 977 | 2/25/2020 | 15 |
| Day 36 | 4/24/2020 | 985 | 2/26/2020 | 15 |
| Day 37 | 4/25/2020 | 1047 | 2/27/2020 | 16 |
| Day 38 | 4/26/2020 | 1118 | 2/28/2020 | 16 |
| Day 39 | 4/27/2020 | 1376 | 2/29/2020 | 24 |



These statistics are undoubtedly an undercount. In prison, just as in the rest of the United States, there are not enough tests.[29] But in three institutions that have now instituted wider testing, the numbers are staggering:

---

[29]    *See* Katie Thomas, *The Latest Obstacle to Getting Tested? A Shortage of Swabs and Face Masks,* N.Y. Times (Mar. 18, 2020), https://www.nytimes.com/2020/03/18/health/coronavirus-test-shortages-face-masks-swabs.html; Lauren Webber et al., *Testing Swabs Run In Short Supply As Makers Try To Speed Up Production*, NPR (Mar. 18, 2020), https://www.npr.org/sections/health-shots/2020/03/18/817801222/testing-swabs-run-in-short-supply-as-makers-try-to-speed-up-production; Matthew Perone, *US virus testing faces new headwind: Lab supply shortages*, ABC News (Mar. 21, 2020); Robert P. Baird, *Why Widespread Coronavirus Testing Isn't Coming Anytime Soon*, The New Yorker (Mar. 24, 2020), https://www.newyorker.com/news/news-desk/why-widespread-coronavirus-testing-isnt-coming-anytime-soon; Steven Mufson et al., *The scramble for the rapid coronavirus tests everybody wants*, Washington Post (Apr. 1, 2020), https://www.washingtonpost.com/health/2020/04/01/scramble-rapid-coronavirus-tests-everybody-wants/.

| INSTITUTION | POSITIVE CASES PRE-WIDESPREAD TESTING (as of April 24, 2020)[30] | POSITIVE CASES POST-WIDESPREAD TESTING (as of April 29, 2020)[31] |
|---|---|---|
| Fort Worth FMC | 132 | 453 |
| Terminal Island FCI | 70 | 242 |
| Butner Medium I | 47 | 221 |

This suggests that the 15 cases listed currently for Butner Low on the BOP's website may be a lack of testing, not a lack of cases.

What is more, inconsistencies and anomalies in the BOP's accounting abound. The BOP has undermined its credibility time and again by failing to provide accurate and transparent accounting of the number of infections in the BOP system. For one, the BOP provides only a snapshot of a moment in time with its numbers. The BOP removes patients who it deems as "recovered" from the positive cases at each institution, making it impossible to know the cumulative number of positive cases at Butner Low since the outbreak began. For another, the BOP finally confirmed last week what many advocates had long suspected: "that the bureau's case tracking does not include the privately run prisons," which have "a combined capacity for nearly 17,600 inmates."[32] The Bureau "did not say why,"[33] and indeed there is no reasonable explanation except that the BOP wants to artificially keep the numbers low. "'This is just

---

[30]     *See* Ex. E (April 24, 2020 BOP COVID-19 Cases).

[31]     *See* Ex. F (April 29, 2020 BOP COVID-19 Cases).

[32]     Dan Kane, *A second federal prison in NC has coronavirus cases, and U.S. officials aren't tracking it*, News & Observer (Apr. 19, 2020), https://www.newsobserver.com/news/local/article242125516.html.

[33]     *Id*.

another example of dereliction of duty as it relates to the safety of that population that's incarcerated by our government[.]'"[34]

Indeed, some BOP institutions have opted to keep some inmate and staff deaths "off the books" completely.  At USP Lompoc, an inmate that appeared to have contracted COVID-19, was put on a bus home (even though he was too sick to walk), only to die thereafter, and is thus not counted as a USP Lompoc death.[35]  Similarly, on April 17, 2020, a 39-year-old staff member at USP Atlanta died suddenly in her home of COVID-19.[36]  The BOP confirmed the staff member's death to a news outlet, but as of Thursday, April 23, 2020, the BOP failed to include this staff member on its COVID-19 website.[37]  Importantly, the press reports that, according to a news release provided by the prison (but not anywhere accessible to others), the deceased staff member "had been successfully screened prior to entry [into the prison] and was asymptomatic" the Friday before she was found dead in her home.[38]  What is more, "four correctional officers at

---

[34]     *Id.*

[35]     Cal Coast Times, *Lompoc prison inmate dies amid worsening coronavirus outbreak* (Apr. 17, 2020), https://calcoasttimes.com/2020/04/17/lompoc-prison-inmate-dies-amid-worsening-coronavirus-outbreak/; Richard Winton, *Coronavirus outbreak at Lompoc prison is the worst in the nation: 69 inmates, 25 staff infected*, LA Times (Apr.16, 2020), https://www.latimes.com/california/story/2020-04-16/coronavirus-outbreak-at-lompoc-federal-prison-is-worst-in-nation-with-69-inmates-25-staff-infected

[36]     Cassidy McDonald, *She was promoted a month before her death. Coworkers say she was never moved into her new role, away from sick inmates*, CBS News (Apr. 20, 2020), https://www.cbsnews.com/news/coronavirus-death-robin-grubbs-atlanta-federal-penitentiary-workers-criticize-covid-19-response/ ("She was promoted a month before her death.")

[37]     *See* BOP, COVID-19 Cases, https://www.bop.gov/coronavirus/ (last accessed 4/22/2020 10:57 a.m.).

[38]     WSBTV.com News Staff, *Atlanta Federal Penitentiary employee found dead tested positive for coronavirus*, WSBTV (Apr. 17, 2020), https://www.wsbtv.com/news/local/atlanta/atlanta-federal-penitentiary-employee-found-dead-tested-positive-coronavirus/UMVOBY6WZVCKHEOGLBHAIESLHU/.

USP Atlanta [] complained of insufficient access to protective equipment and inconsistent communication about how many staff and inmates were infected at any given time."[39]

That the BOP wishes to keep the numbers low at the expense of accuracy, transparency, and staff and inmates' health is supported by the fact that, in at least one facility, BOP has declared all inmates presumptively infected, stopped testing altogether, and is refusing to release infection estimates.[40]  In another, the president of the correctional officers union estimates inmate infection at 600% of BOP's public number.[41]  One BOP employee told news reporters that "the Bureau is playing with these numbers . . . , if they don't test 'em and they don't get confirmed they don't have to be reported."[42]  At one facility where six inmates have already died of COVID-19, which houses a total of 2,421 inmates, the government recently revealed that the

---

[39]      *She was promoted a month before her death*,
https://www.cbsnews.com/news/coronavirus-death-robin-grubbs-atlanta-federal-penitentiary-workers-criticize-covid-19-response/.

[40]      Nicholas Chrastil, *Louisiana Federal Prison No Longer Testing Symptomatic Inmates for Coronavirus Due To 'Sustained Transmission*,' The Lens (Mar. 31, 2020),
https://thelensnola.org/2020/03/31/louisiana-federal-prison-no-longer-testing-symptomatic-inmates-for-coronavirus-due-to-sustained-transmission/ (hereinafter, "Louisiana Prison No Longer Testing") ("But the spokesperson said that the BOP would not be releasing the number of presumed positive cases, making it impossible to know how many prisoners at the facility have actually contracted the virus.").

[41]      Staff report, *Elkton union president reports different COVID-19 stats than Federal Bureau of Prisons*, WKBN News, Lisbon Ohio (Apr. 9, 2020),
https://www.wkbn.com/news/coronavirus/elkton-union-president-reports-different-covid-19-stats-than-federal-bureau-of-prisons/ (stating that BOP was reporting just 10 inmate infections, but the union president had said management inside the prison gave "different numbers": 67 positive or symptomatic and isolated, 44 hospitalized, 14 on ventilators, 12 staff infected, three dead).

[42]      *Louisiana Federal Prison No Longer Testing*,
https://thelensnola.org/2020/03/31/louisiana-federal-prison-no-longer-testing-symptomatic-inmates-for-coronavirus-due-to-sustained-transmission/

facility only had 55 coronavirus tests, had only actually tested 37 inmates, and had only recently received 25 additional "rapid tests," though it now expected 25 more each week.[43]  Indeed, at this facility, when the BOP listed on its website that there were 59 confirmed cases, "[o]fficials suspect[ed] another 207 have it."[44]

Even if the numbers were accurate, the BOP is failing in its duty to protect inmates and staff from this pandemic, which in turn has threatened surrounding communities.  Since the start of the pandemic, reports have poured in citing BOP's incompetence at every level, including non-existent education to the inmates and correctional officers about the spread of the virus, dubious staffing decisions that undermine the safe-keeping of quarantined inmates, and inadequate testing to confirm credible numbers of cases.[45]  The BOP cannot contain the virus, just as the rest of the world has been unable to.  The difference, importantly, is that those outside the walls of a prison have the option to protect themselves by sheltering at home and avoiding close contact with others—steps that can mean the difference between life and death.

---

[43]     Eric Heisig, *Judge grills federal prisons lawyer on lack of coronavirus tests at Ohio facility in wake of Trump's claim that 'anybody' can get tested*, Cleveland.com (last updated Apr. 18, 2020). https://www.cleveland.com/court-justice/2020/04/judge-grills-federal-prisons-lawyer-on-lack-of-coronavirus-tests-at-ohio-facility-in-wake-of-trumps-claim-that-anybody-can-get-tested.html ("Judge grills federal prisons lawyer on lack of coronavirus tests").

[44]     *Id*.

[45]     Janet Reitman, *'Something Is Going to Explode': When Coronavirus Strikes a Prison: An oral history of the first fatal outbreak in the federal prison system, in Oakdale, La.,* The New York Times Magazine (April 18, 2020) https://www.nytimes.com/2020/04/18/magazine/oakdale-federal-prison-coronavirus.html; *Judge grills federal prisons lawyer on lack of coronavirus tests,* https://www.cleveland.com/court-justice/2020/04/judge-grills-federal-prisons-lawyer-on-lack-of-coronavirus-tests-at-ohio-facility-in-wake-of-trumps-claim-that-anybody-can-get-tested.html; James Call, *Correctional officers file complaint about coronavirus at federal prison in Tallahassee*, Tallahassee Democrat. (April 17, 2020), https://www.tallahassee.com/story/news/politics/2020/04/18/correctional-officers-file-complaint-coronavirus-tallahassee-federal-prison/5152879002/

The virus is spread by asymptomatic and presymptomatic individuals, so that those exhibiting no symptoms may pass it along to others.[46]  And there is simply inadequate personal protective equipment in prisons, just as is there on the outside.[47]  Thus no matter the Bureau of Prisons' commitment to safety, the fact remains that "[t]he close quarters of jails and prisons, the inability to employ effective social distancing measures, the use of shared toilets, sinks, and showers, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely."  *See* Ex. B (DC Medical and Public Health School Faculty COVID-19 Letter) at 3.

Many courts have granted compassionate release motions based, at least in part, on the COVID-19 crisis and the BOP's inability to contain it.  *United States v. Hammond*, No. 1:02-cr-00294 (BAH), ECF No. 54, (Apr. 16, 2020); *United States v. Powell*, No. 1:94-cr-00316 (ESH), ECF No. 97, (Mar. 28, 2020); *United States v. Carlos Curtis*, No. 1:03-cr-00533 (BAH), ECF No. 238, (April 22, 2020); *United States v. Jennings*, No. 18-cr-17 (TSC), ECF No. 30, (Apr. 22, 2020); *United States v. Ghorbani* No. 1:18-cr-00255 (PLF), ECF No. 133, (Apr. 6, 2020).  S*ee also, e.g.*, *United States v. Muniz*, 2020 WL 1540325, at *2 (S.D. Tex. Mar. 30, 2020) ("Because Defendant is at high-risk for severe illness from COVID-19 and because inmates in detention facilities are particularly vulnerable to infection, the Court finds that Defendant has demonstrated an extraordinary and compelling reason for compassionate release."); *United States v.*

---

[46]     Apoorva Mandavilli, *Infected but Feeling Fine: The Unwitting Coronavirus Spreaders*, N.Y. Times (Mar. 31, 2020), https://www.nytimes.com/2020/03/31/health/coronavirus-asymptomatic-transmission.html.

[47]     *See, e.g, Sick Staff, Inmate Transfers, and No Tests:* https://www.vice.com/en_us/article/jge4vg/sick-staff-inmate-transfers-and-no-tests-how-the-us-is-failing-federal-inmates-as-coronavirus-hits; Joseph Neff & Keri Blakinger, *Federal Prisons Agency "Put Staff in Harm's Way" of Coronavirus,* The Marshall Project (Apr. 3, 2020), https://www.themarshallproject.org/2020/04/03/federal-prisons-agency-put-staff-in-harm-s-way-of-coronavirus.

*Compagna*, 2020 WL 1489829, at *3 (S.D.N.Y. Mar. 27, 2020) ("Defendant's compromised

immune system, taken in concert with the COVID-19 public health crisis, constitutes an

extraordinary and compelling reason to modify Defendant's sentence on the grounds that he is

suffering from a serious medical condition that substantially diminishes his ability to provide

self-care within the environment of the RCC." (citing U.S.S.G. § 1B1.13, appl. n. 1(A))); *United*

*States v. Perez*, 2020 WL 1546422, at *1 (S.D.N.Y. Apr. 1, 2020) (finding the COVID-19 "threat

. . . constitutes an extraordinary and compelling reason to reduce Perez's sentence to time

served"); *United States v. Andre Williams*, No. 3:04cr95/MCR, Order at 7, ECF No. 91 (N.D.

Fla. Apr. 1, 2020) (recognizing that an outbreak of COVID-19 in Williams' facility would likely

have fatal consequences for him" and granting compassionate release to defendant who had

served 15 years of a life sentence for repeated (at least six prior) armed bank robberies);

*Rodriguez*, 2020 U.S. Dist. LEXIS 58718, at *2-3 (finding, for defendant with diabetes, "nothing

could be more extraordinary and compelling than this pandemic" and "reach[ing] the inescapable

conclusion that Mr. Rodriguez must be granted 'compassionate release'"); *United States v.*

*Edwards*, No. 6:17-cr-003-NKM, Order at 10, ECF No. 134 (W.D. Va. Apr. 2, 2020) (finding

defendant's already strong case for compassionate release based on terminal cancer "further

substantiated with a particularized showing that he is susceptible to contracting COVID-19, and

that he is at high risk if he contracts it"); *United States v. Foster*, No. 1:14-cr-324-JEJ, Mem. &

Order at 7, ECF No. 191 (M.D. Pa. Apr. 3, 2020) (granting compassionate release to defendant

with chronic lung illness, who was previously denied compassionate release on same basis, in

light of COVID-19 because he "already struggles to breathe on a daily basis", and his chronic

lung disease "may very well equate a COVID-19 diagnosis with a death sentence"), *United*

*States v. Collins*, Crim No. 10-CCB-0336, ECF 1028 (Mar 30, 2020) (granting compassionate

release even when the defendant did not have an underlying medical condition because, "the court must acknowledge the extraordinary circumstances present in the community as a result of the COVID-19 pandemic. It is well established by public health authorities that efforts should be made to permit social distancing and minimize the risks of transmission through close contact."), *United States v. Grobman*, No. 18-cr-20989, ECF 397 (S.D. Fla. Mar. 29, 2020) (releasing defendant convicted of fraud in light of "extraordinary situation of a medically-compromised detainee being housed at a detention center where it is difficult, if not impossible, for [the defendant] and others to practice the social distancing measures which government, public health and medical officials all advocate"); *United States v. Stephens*, 2020 WL 1295155 (S.D.N.Y. Mar. 19, 2020) (releasing defendant in light of "the unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic").[48]  This Court should do the same.

### C. The Extraordinary and Compelling Circumstances of COVID-19, Coupled with Mr. Lawson's Pre-Existing Condition and the Conditions at Butner Low, Warrant Compassionate Release.

Mr. Lawson suffers from chronic asthma.  *See* No. 13-cr-290 (BAH), PSR ¶62.  Since the pandemic began, it has been widely known that COVID-19 damages the lungs by "inflaming and clogging the tiny air sacs in the lungs, choking off the body's oxygen supply until it shuts down

---

[48]	*See also United States v. Resnick*, No. 1:12-cr-152-CM, Dec. & Order Granting Comp. Rel. at 13, ECF No. 461 (S.D.N.Y. Apr. 2, 2020) ("Releasing a prisoner who is for all practical purposes deserving of compassionate release during normal times is all but mandated in the age of COVID-19."); *United States v. Colvin*, No. 3:19-cr-179-JBA, Ruling Granting Def.'s Mot. for Comp. Rel., ECF No. 38 (D. Conn. Apr. 2, 2020); *United States v. Huneeus*, No. 1:19-cr-10117-IT, Order, ECF No. 642 (D. Mass. Mar. 17, 2020) (granting compassionate release "in light of the national state of emergency" and defendant's "unique health circumstances"); *United States v. Copeland,* No. 2:05-cr-135-DCN (D.S.C. Mar. 24, 2020); *United States v. Marin*, No. 15-cr-252, Min. Order, ECF. No. 1326 (E.D.N.Y. Mar. 30, 2020); *United States v. West*, No. 1:17-cr-390-AT-1, Corrected Order (Redacted), ECF No. 53 (N.D. Ga. Mar. 30, 2020); *United States v. Powell*, No. 94-cr-316 (ESH), ECF No. 96 (Emergency Mot.), ECF No. 97 (Order) (Mar. 28, 2020) (granting unopposed motion for compassionate release in light of COVID-19).

the organs essential for life."[49]   The Centers for Disease Control has found that, "People with moderate to severe asthma may be at higher risk of getting very sick from COVID-19 [because] COVID-19 can affect your respiratory tract (nose, throat, lungs), cause an asthma attack, and possibly lead to pneumonia and acute respiratory disease."[50]   And "[p]neumonia caused by the coronavirus has had a stunning impact on the [] hospital system" in one of the most hard-hit areas of the United States, with reports that "[b]y the time patients have noticeable trouble breathing and present to the hospital with dangerously low oxygen levels, many will ultimately require a ventilator."[51]

Although, like much of what is still unknown about COVID-19, "the data analysis on the effects of asthma is in its infancy," health experts cite "an existing body of research that shows the flu and milder coronaviruses exacerbate asthma."[52]   Indeed, "viral infections are the No. 1 cause of asthma flares in both children and adults under normal conditions."[53] Additionally,

---

[49]      Lenny Bernstein et al., *Coronavirus destroys lungs. But doctors are finding its damage in kidneys, hearts and elsewhere,* Washington Post (Apr. 15, 2020), https://www.washingtonpost.com/health/coronavirus-destroys-lungs-but-doctors-are-finding-its-damage-in-kidneys-hearts-and-elsewhere/2020/04/14/7ff71ee0-7db1-11ea-a3ee-13e1ae0a3571_story.html.

[50]      *People Who Are At Higher Risk*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/asthma.html.

[51]      Richard Levitan, *The Infection That's Silently Killing Coronavirus Patients*, N.Y. Times (Apr. 20, 2020), https://www.nytimes.com/2020/04/20/opinion/coronavirus-testing-pneumonia.html.

[52]      Danny Hakim, *Asthma Is Absent Among Top Covid-19 Risk Factors, Early Data Shows,* The New York Times (Apr. 16, 2020), https://www.nytimes.com/2020/04/16/health/coronavirus-asthma-risk.html.

[53]      Danny Hakim, *Asthma Is Absent Among Top Covid-19 Risk Factors, Early Data Shows,* The New York Times (Apr. 16, 2020), https://www.nytimes.com/2020/04/16/health/coronavirus-asthma-risk.html.

those with asthma may confuse COVID-19 symptoms with asthmatic symptoms, leaving them unaware they need to seek a different remedy than reaching for their inhaler.[54]

Asthma, by definition, is a lung condition in which the airways in the lungs narrow and swell, making it difficult to breathe.  The swelling can also produce extra mucus, which can make it even more difficult to obtain an adequate oxygen supply.[55]  Dr. Lakiea Wright, a specialist in allergies and immunology at Brigham and Women's Hospital in Boston noted, "You can imagine if a virus that causes extra inflammation gets in there, then that's going to be worse . . . Those are the patients who might end up on ventilators to help with breathing because Covid-19 is doing a lot of damage in the lungs."[56]  The CDC therefore recommends that people with asthma, avoid crowds, "stay home as much as possible to further reduce your risk of being exposed," and "avoid touching high-touch surfaces."[57]  Mr. Lawson can follow nearly none of these suggestions.

---

[54]    Sandee LaMotte, *Asthma and Coronavirus: Act Now to Decrease Your Chance of a Serious Outcome*, CNN (April 21, 2020), https://www.cnn.com/2020/04/21/health/asthma-coronavirus-wellness/index.html, ("Many of the key signs of Covid-19, such as coughing, shortness of breath and chest tightness, are also typical symptoms of asthma. Other potential Covid-19 signs, such as sneezing, runny nose, red eyes and fatigue, can mimic allergy responses.")

[55]    "Patient Care & Health Information: Diseases & Conditions: Asthma" Mayo Clinic (accessed April 21, 2020), https://www.mayoclinic.org/diseases-conditions/asthma/symptoms-causes/syc-20369653.

[56]    Sandee LaMotte, *Asthma and Coronavirus: Act Now to Decrease Your Chance of a Serious Outcome*, CNN (April 21, 2020), https://www.cnn.com/2020/04/21/health/asthma-coronavirus-wellness/index.html.

[57]    *People Who Are At Higher Risk*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/asthma.html.

Should Mr. Lawson contract COVID-19, the results may be devastating.  "The time course of the disease can be very rapid.  Individuals can show the first symptoms of infection in as little as two days after exposure and their condition can seriously deteriorate in as little as five days (perhaps sooner) after that."  Ex. C (Declaration of Dr. Marc Stern) at ¶4.  "Vulnerable people who are infected by the COVID-19 virus can experience severe respiratory illness, as well as damage to other major organs.  Treatment for serious cases of COVID-19 requires significant advanced support, including ventilator assistance for respiration and intensive care support."  *Id*. at ¶6.  Ventilators are currently in short supply in the United States; if Mr. Lawson falls ill, there is no guarantee that he will have access to one.

There is currently no vaccine to prevent COVID-19 and no known cure or antiviral treatment for COVID-19.  "Social distancing and hand hygiene are the *only* known ways to prevent the rapid spread of COVID-19."  *See* Ex. D (Declaration of Robert B. Greifinger, MD) at ¶8 (emphasis added).  But even if Mr. Lawson were able to wash his hands assiduously in BOP custody, he simply cannot socially distance in prison.  The exponential infection rate of COVID-19 and high mortality rate for those with pre-existing conditions, coupled with the proven inability of the BOP to address a surge in cases, make clear that these are just the kind of extraordinary and compelling circumstances that warrant a sentence reduction in this case.

## III.  MR. LAWSON IS NOT A DANGER TO THE COMMUNITY AND HIS CONTINUED INCARCERATION IS GREATER THAN NECESSARY TO ACCOMPLISH THE GOALS OF SENTENCING.

The § 3553(a) factors also support compassionate release.  Mr. Lawson is a non-violent offender who is not a danger to the community.  He has already completed his sentence in Case No. 13-cr-290 (BAH), which gave rise to this revocation sentence.  His offense in Case No. 13-cr-290 (BAH) was non-violent, as was his original offense in the instant case.  Mr. Lawson is at

a low security institution, and has 40 days left of his revocation sentence to serve.  He would have been at a halfway house by now had the BOP not misidentified him as having a detainer and Hope Village not been slated to close.

In the alarming crisis that is unfolding, the universally-recommended antidote has been to release those whose continued incarceration is not necessary to protect the public so that correctional institutions can better protect those who need to stay incarcerated through this pandemic.  Experts agree that the "release of detainees who present a low risk of harm to the community is [] an important mitigation strategy" for Butner Low and the community as a whole, because, by shrinking the inmate population, "it allows for greater social distancing, which reduces the chance of spread if the virus is introduced; it allows easier provision of preventive measures such as soap for handwashing, cleaning supplies for surfaces, frequent laundering and showers, etc.; and it helps prevent overloading the work of detention staff such that they can continue to ensure the safety of detainees."  *See* Ex. C (Declaration of Dr. Marc Stern) at ¶9.[58]

"Any limited risk [to releasing Mr. Lawson one month early] can be mitigated by supervision."  *Bellamy*, 2019 WL 3340699, at *6.  Indeed, Mr. Lawson will be on strict conditions of supervision upon her release for a 5-year period of time in Case No. 13-cr-290

---

[58]     "[A]ll prisoners, even those that remain detained, benefit from the release of some inmates to counter overcrowding because the detained inmates are that system's next potential victims." *Banks v. Booth*, Case No. 20-cv-00849, 2020 WL _____, *8-9 (D.D.C. April 19, 2020) (internal quotations omitted). "No man's health is an island. If Plaintiffs contract COVID-19, they risk infecting others inside the DOC facilities," and "also risk infecting DOC staff members who work inside DOC facilities but also live in the community, thus increasing the number of people vulnerable to infection in the community at large . . .  if Plaintiffs contract COVID-19 and experience complications, they will be transported to community hospitals—thereby using scarce community resources (ER beds, general hospital beds, ICU beds). As such, ordering Defendants to take precautions to lower the risk of infections for Plaintiffs also benefits the public." *Id*. (internal quotations and citations omitted).

(BAH)   A reduction of Mr. Lawson's revocation sentence to time served would not diminish the

seriousness of his offense, nor would it place the public in any danger, and because of his age,

asthma, and the COVID-19 pandemic, "a longer sentence would be greater than necessary to

serve those purposes."  *Beck*, 2019 WL 2716505, at *12.  The extraordinary and compelling

circumstances presented by the uncontrolled spread of COVID-19—compounded by the

heightened risks faced by Mr. Lawson, in particular, whose ability to engage in basic self-

protective measures is restricted and whose underlying lung disease pose grave concerns—

warrant relief.[59]

## IV.    MR. LAWSON'S RELEASE PLAN

Upon his release, Mr. Lawson will reside in Northwest Washington, D.C., with his

girlfriend and his girlfriend's child, both of whom are healthy; counsel can provide probation

with the address and telephone number upon request.  Mr. Lawson will be able to find work

through his union, Painters and Allied Trades (Local Union 1963/51).

## CONCLUSION

"People do not stop being human the day they are sentenced.  Although some have made

terrible choices or engaged in reprehensible behavior, the sentence they received for their crime

did not include contracting COVID-19 and death."[60]  For the foregoing reasons, Mr. Lawson

---

[59]     In the alternative, under 18 U.S.C. § 3621(b)(4), this Court should recommend to the BOP that Mr. Lawson be placed on home confinement under 18 U.S.C. § 3624(c) for the remainder of his sentence.

[60]     DA Rachael Rollins, *Statement of Suffolk County District Attorney Rachael Rollins on today's hearing before the Supreme Judicial Court* (Mar. 31, 2020), https://www.suffolkdistrictattorney.com/press-releases/items/2020/3/31/statement-of-suffolk-county-district-attorney-rachael-rollins-on-todays-hearing-before-the-supreme-judicial-court.

respectfully requests that this Court grant his emergency motion and order his immediate release from Butner Low.

A proposed order is attached.  Mr. Lawson respectfully requests that this Court issue an amended judgment as well, as the BOP has indicated in some (though not all) cases that it requires such an amended judgment prior to processing compassionate release orders.


Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
JOANNA MUNSON PERALES
Research & Writing Attorney
625 Indiana Ave. NW, Ste. 550
Washington, D.C. 20004
(202) 208-7500